UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

NO. 08-80431-CIV-MARRA/JOHNSON

CAROL LINDSEY MUNROE,

    Plaintiff,

v.

PARTSBASE, INC., a Florida corporation,
and ROBERT A. HAMMOND,
individually,

    Defendants.
_____/

## ORDER AND OPINION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court on Defendants Partsbase, Inc. And Robert A. Hammond's ("Defendants") Motion for Summary Judgment and Incorporated Memorandum of Law (DE 56), filed December 8, 2008. Plaintiff Carol Lindsey Munroe ("Plaintiff" or "Munroe") filed a Response (DE 75/76) on January 6, 2009 and Defendants filed a Reply (DE 80) on January 16, 2009. The motion is fully briefed and ripe for review. The Court has reviewed the Motion, the entire file in this case, and is otherwise duly advised in the premises.

**Background**

Plaintiff, a former employee of Defendants, brought claims against Defendants for violating the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA") (See Am. Compl., DE 22). Defendant PartsBase, Inc. ("PartsBase") is an internet-based membership service that lists aircraft parts for sale. [Tolley Decl. re "off the clock"(DE 59-2) at ¶ 3; Munroe Dep. (DE 61-2)

1

at 76:17-19]. Members include both buyers and sellers of aircraft parts. [Tolley Decl. re "off the clock" at ¶ 3]. PartsBase employs approximately 50 Sales Representatives. [Tolley Decl. re "off the clock" at ¶ 4]. Plaintiff, Carol Lindsey Munroe, is a former Sales Representative for PartsBase. [Tolley Decl. re violation of confidentiality (DE 12-2) at ¶ 3].

Plaintiff alleges that Defendants failed to compensate her the basic minimum wages under the FLSA for certain workweeks where no commissions were earned. (Am. Compl. ¶¶ 11, 17, 20). Plaintiff also alleges that Defendants required her to work in excess of forty (40) hours per week and willfully refused to properly compensate her pursuant to the FLSA (Am. Compl. ¶¶ 10, 16, 19). Defendants counterclaimed for breach of confidentiality agreement and conversion (See Am. Ctrclm., DE 21, ¶¶ 4-10, 11-23). In response to the counterclaims, Plaintiff amended her complaint to add FLSA anti-retaliation claims against Defendants. (See Am. Compl. Ret., DE 48, ¶¶ 22-24, 25-27).

## STANDARD OF REVIEW

Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of showing the Court, by reference to the record, that there are no genuine issues of material fact that should be decided at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the non-moving party bears the burden of proof on an issue, the moving party may discharge its burden by showing that the materials on file demonstrate that the party bearing the burden of proof at trial will not be able to meet its burden. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608

(11th Cir. 1991).

When a moving party has discharged its burden, the nonmoving party must "go beyond the pleadings," and, by its own affidavits or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial. Celotex, 477 U.S. at 324.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  When deciding whether summary judgment is appropriate, the Court must view the evidence and all reasonable factual inferences therefrom in the light most favorable to the party opposing the motion. Witter v. Delta Air Lines, Inc., 138 F.3d 1366, 1369 (citations and quotations omitted).

**DISCUSSION**

**Counts I & II - FLSA claims against Defendants Partsbase and Hammond**

**A. Minimum Wage Pay**

The FLSA generally requires the payment of at least the prescribed minimum wage each workweek. See 29 U.S.C. § 206(a).  Counts I and II of the Amended Complaint (DE 22) allege, in part, that Defendants failed to pay Plaintiff the federal minimum wage.  Notwithstanding, there are no material issues of disputed fact regarding Plaintiff's minimum wage claim.  Specifically, Plaintiff does not contest the fact that, once commissions paid to Plaintiff are considered in addition to her straight salary, Plaintiff is unaware of any workweeks in which she received less than the minimum wage. [Munroe Dep. at 148:21-149:12].  Accordingly, Defendants are entitled to summary judgment as to Plaintiff's claim for minimum wage pay as alleged in Counts I and II of the Amended Complaint.

**B. Overtime Pay**

The FLSA generally requires employers to pay employees overtime compensation, at a rate not less than one and one-half times the regular rate, for any time worked in a workweek in excess of forty hours. See 29 U.S.C. § 207(a)(2)(C). In addition to Plaintiff's minimum wage claim, Counts I and II of the Amended Complaint (DE 22) allege, in part, that Defendants failed to pay Plaintiff overtime compensation, in violation of the FLSA. The primary issue in this case involves Defendants' alleged failure to compensate Plaintiff for overtime hours that she worked "off the clock." To prove an overtime claim, a plaintiff must demonstrate that (1) he or she worked overtime without compensation and (2) Defendants knew or should have known of the overtime work. Allen v. Board of Public Educ. for Bibb County, 495 F.3d 1306, 1314-15 (11th Cir. 2007).

> A person is employed if he or she is suffered or permitted to work. 29 U.S.C. § 203(g). It is not relevant that the employer did not ask the employee to do the work. The reason that the employee performed the work is also not relevant. "[I]f the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted." Reich v. Dep't of Conservation and Nat. Res., 28 F.3d 1076, 1082 (11th Cir. 1994) (citing 29 C.F.R. § 785.11). . . . see also 29 C.F.R. § 785.11 (interpreting the "suffer or permit to work" requirement to mean that an employer violates the FLSA when it "knows or has reason to believe that he is continuing to work and the time is working time.")

Allen, 495 F.3d at 1314-15.

Here, factual questions exist with regard to Defendants' accurate record keeping of Plaintiff's unpaid overtime hours. While the parties agree that Plaintiff was paid based on the hours submitted for her timesheets, there are genuine issues of material fact as to whether Defendants repeatedly altered Plaintiff's time records to evidence 40 hours, and consistently failed to pay Plaintiff for her weekend work and on days when Plaintiff did not clock out. (Munroe Dep.

4

215:15-21). Plaintiff has provided affidavit testimony from both herself and another former employee, Cindy Gonzalez, evidencing alteration of time-sheets with overtime hours, and unpaid workdays, including Saturdays.

Plaintiff points to evidence that Defendants did not pay overtime pay for hours greater than 40 in a work week. [Munroe Aff. (DE 78-4) at ¶2]. Prior to August of 2006, Plaintiff, and all employees, were required to work mandatory Saturdays. [Munroe Dep. (DE 61-2) 37:3-15]. However, Plaintiff would not receive any overtime compensation for these mandatory Saturday hours. [Munroe Aff. at ¶10]. Furthermore, Defendants had a time clock that would, on occasion, fail to clock in or clock out Plaintiff. [Munroe Dep. 71:4-19; Munroe Aff. at ¶11]. On those dates, numerous time records show Plaintiff receiving no compensation at all for the day. [Munroe Aff. at ¶11]. For example, on November 8, 2007, Plaintiff clocked in at 8:05 a.m, yet no clock out was registered that day. [Munroe Dep. 215:15-19]. As a result, Plaintiff asserts she received no hours or compensation for this day's work. [Munroe Dep. 215:20-21].

Moreover, and central to Plaintiff's claim, Plaintiff points to evidence that her time sheet could not show more than 40 hours per week, regardless the amount of hours actually worked. [Munroe Aff. at ¶3]. Plaintiff has presented evidence to support her claim that Defendants would regularly see Plaintiff's timesheets evidencing greater than 40 hours per week [Tolley Dep. 21:13-25], yet, at the end of the week, Defendants would intentionally have these records altered, requiring Plaintiff to slash her hours to 8 hours per day to total a 40-hour workweek with no overtime. [Munroe Dep. 213:7-25; 214:1-7; Munroe Aff. at ¶4]. The timesheets would be altered by Plaintiff's supervisor, Rebecca Flick, either directly or per Flick's instructions. [Exhibit 1, DE 78-2; Munroe Aff. at ¶4]. Flick instructed Plaintiff to change her timesheets to evidence a

40-hour workweek despite the actual hours Plaintiff worked. [Munroe Dep. 213:7-25; 214:1-7; Munroe Aff. ¶ 4]. Another employee, Cindy Gonzalez, experienced the same form of time-altering records as Plaintiff. [Gonzalez Aff. (DE 78-5) at ¶3].

Additionally, genuine issues of material fact exist with regard to Defendant's knowledge of Plaintiff's unauthorized overtime hours. Defendants point to evidence that the only way that PartsBase can track the working hours of each Sales Representative is through their timesheets. [Tolley Decl. re "off the clock" at ¶ 4]. Defendants assert that Munroe understood that, by clocking out, she was sending the message to management that she was not working. [Munroe Dep. at 18:21-24]. PartsBase's President and Chief Information Officer, Brian Tolley, was unaware of any "off the clock" work by Munroe, and would not have permitted Munroe to work "off the clock" if he had known about it. [Tolley Decl. re "off the clock" at ¶ 6]. If Munroe felt she had worked overtime and had not been paid, she was required to bring this to the immediate attention of senior management for corrective action. [Tolley Decl. re "off the clock" at ¶ 4]. Munroe never submitted a complaint to the Company saying she had worked overtime, and that the Company had failed to pay her overtime compensation. [Munroe Dep. at 55:25-56:3]. In fact, on several occasions Munroe met with company officials for videotaped questioning, and told them the Company did not owe her overtime pay. [Munroe Dep. at 59:13-15; 67:23-68:13; 73:1-11; Tolley Decl. re "off the clock" at ¶ 6].

As Defendants point out, Plaintiff admitted that when she came in early or on Saturdays to work off the clock, she did not have permission from her supervisor to do so. [Munroe Dep. at 155:13-19; 163:8-13]. No managers regularly came in on Saturday, and Munroe did not always tell her own supervisor, Rebecca Flick, when she had worked on Saturdays. [Munroe at 164:

14-15; 165:5-12]. Munroe's supervisor, Rebecca Flick, was unaware of any "off the clock" work by Munroe, and would not have permitted Munroe to work "off the clock" if Flick had known about it. [Flick Decl. at ¶ 5]. Nor can Munroe say that Flick knew or should have known that Munroe was working off the clock, because Flick was not always in Munroe's presence. "I didn't pay attention to when [Flick] was coming and going. I was at my computer doing my job so I wasn't paying attention to what she was doing. She could be going into meetings and doing all kinds of things and I would have had no idea." [Munroe Dep. at 168:6-10].

In contrast, Plaintiff points to evidence that Defendants knew that Plaintiff was working more hours than her timesheets were reflecting, yet chose to not recognize these hours and pay Plaintiff. [Munroe Aff. at ¶ 3]. Altered timesheets were turned into management [Tolley Dep. 21:13-25]. Thus, Defendants would see that Plaintiff's timesheets were being changed in order to evidence 40 hours per week. [Munroe Dep. 213:7-25; 214:1-7; Munroe Aff. ¶ 5]. Tolley, as Chief Information Officer for the Defendants, had knowledge of the altered timesheets, yet chose not to pay Plaintiff for it because she "never filed a claim or complaint." [Tolley Dep.57:13-21].

Additionally, according to Plaintiff's affidavit, it was well known throughout the company that Plaintiff worked before her clock in and after her clock out, which was a necessary part of working at PartsBase. [Munroe Aff. at ¶ 12]. Plaintiff sent multiple emails before and after her regular scheduled hours. [Munroe Dep. 204:17-25; 205:1-9]. Furthermore, her direct supervisor, Rebecca Flick, would routinely see Plaintiff working at her desk prior to the scheduled 8-5 work day, and after those times. [Munroe Dep. 155:21-25; 156:1-5; 169:6-12]. Flick was happy with the hours Plaintiff was putting in. [Munroe Dep. 155:17-20]. Flick would also notice Plaintiff was at her desk during her lunch hour and would remind her that she needs to clock out at this time.

[Munroe Dep. 17:19-25; 18:1]. Flick also had a conversation with Plaintiff about the overtime policy and the failure of Defendants to pay overtime to Plaintiff for the hours worked, to which no actions had been taken. [Munroe Dep. 52:9-25; 53:1-22]. Plaintiff sometimes notified Flick that she worked on Saturday. [Munroe Dep. 164:16-25; 165:1-12]. Defendants Chief Information Officer, Brian Tolley, admitted that he knew that Plaintiff worked Saturdays. [Tolley Dep. 82:15-17].

     Plaintiff points to the monthly videotaped questioning as evidence that Defendants knew that overtime pay was an issue. Tolley was one of the individuals responsible for interviewing the employees about overtime. [Tolley Dep. 104:12-19]. Plaintiff points to evidence that these videotaped interrogations were forced interviews where the Plaintiff, as well as Gonzalez and other employees, were required to agree with whatever was asked of them in the video sessions, and were required to sign documentation to that effect. [Munroe Aff. ¶ 17; Gonzalez Aff. ¶ 8]. Some of these documents were even illegible, yet still signed by Plaintiff. [Munroe Dep. 205:10-206:25]. Specifically, employees were required to agree on videotape that no overtime was owed to the employee. [Munroe Aff. ¶ 15; Gonzalez Aff. ¶ 6]. Plaintiff points out that, as further evidence that Tolley was aware that overtime was an issue, was the fact that the questions regarding the overtime in the videos were craftily placed in the middle of a questionnaire regarding an injunction from a separate action with a company called ILS. [Tolley Dep. 97:17-25; 98:1; 99:10-24; Munroe Aff. ¶ 16; Gonzalez Aff. ¶ 7]. Tolley was fully aware that the questions regarding the overtime pay had nothing to do with the injunction [Tolley Dep. 97:17-25; 98:1], yet realized that he could attempt to prove that no overtime was owed by having employees agree to this statement once a month. [Munroe Aff. ¶ 17; Gonzalez Aff. ¶ 8]. This occurred after

Defendants had been sued for FLSA violations. [Tolley Dep. 100:21-25].

Based on the foregoing, there are genuine issues of material fact precluding summary judgment as to Plaintiff's claim for overtime pay as alleged in Counts I and II of the Amended Complaint.

**Counterclaim Count I: Breach of Confidentiality Agreement**

Because the Court is sitting in diversity, Florida substantive law applies. See, e.g., Admiral Ins. Co. v. Feit Management Co., 321 F.3d 1326, 1328 (11th Cir. 2003) ("Sitting in diversity, we apply the substantive law of the forum state unless federal constitutional or statutory law compels a contrary result.").

Under Florida law, a breach of contract action requires three elements: a valid contract, a material breach of that contract, and damages. See, e.g., Beck v. Lazard Freres & Co., LLC, 175 F.3d 913, 914 (11th Cir. 1999); Miller v. Nifakos, 655 So. 2d 192, 193 (Fla. 4th DCA 1995).

Here, there is no dispute of fact regarding the existence of a valid contract. Munroe signed PartsBase's confidentiality agreements in May of 2003 and September of 2004. [Munroe Dep. at 13:10-12 and 14:13-18 and Exh. 3 and 4 thereto]. However, there are genuine disputes of material fact regarding whether there was a material breach of the confidentiality agreement and whether PartsBase suffered damages therefrom.

PartsBase point to the following as evidence that Plaintiff violated the agreement: When Tolley reviewed the recorded results of Munroe's work activity, he discovered that Munroe had been corresponding with an ex-employee of PartsBase, Frank Rivera, who appeared to work for a company called "Channel For" of the Netherlands, as well as additional fictitious corporate aliases. [Tolley Decl. re Violation of Confidentiality at ¶ 8 (DE 12-2)]. Munroe spent working

time at PartsBase running Prospect Inventory reports for Rivera, and sending multiple emails to Rivera enclosing confidential company records from PartsBase's internal sales management system. [Tolley Decl. re Violation of Confidentiality at ¶¶ 9, 10 (DE 12-2)].  These Prospect Inventory reports provide prospective customers information regarding other PartsBase members who are looking for certain parts, and when the parts are sought.  [Id.]  This information is a lead list that could be used by a broker or a distributor to make additional sales for companies looking for parts.  [Id.]  This system is accessible only to employees of PartsBase holding an active user name and password.  [Id.]  Neither the company Rivera worked for, nor the fictitious companies for which he masqueraded, were PartsBase members or prospect accounts that Munroe would have been working to service or to sell a subscription.  [Id.].

In contrast, Plaintiff points to the following as evidence that Plaintiff did not violate the confidentiality agreement:  There was no confidential information disclosed to Rivera [Munroe Dep. 83:5-16].  The information being disclosed to Rivera was not confidential, but was instead simply a tool that is provided to Defendant's customers and prospective customers to generate and secure business. [Munroe Dep. 83:5-16].  Plaintiff maintains that PartsBase is simply applying their own definition of what is confidential.

There are also genuine issues of material fact as to whether the alleged breach of confidentiality agreement resulted in damages to PartsBase.

PartsBase offers evidence of several theories of damages, each of which Plaintiff disputes. First, by surreptitiously providing pricing information to Rivera and his company for free, Plaintiff deprived PartsBase of the opportunity to sell similar information to Rivera and his company via a membership, and to do advertising through PartsBase, which had been worth a combined $14,000

per year.  [Tolley Decl. re "damages" at ¶ 7; Tolley Dep. 111:12-113:21].  Plaintiff offers the following evidence to contradict PartsBase's first damages theory:  Rivera and his company, Channel For, were already terminated from using the PartsBase website, and had already been denied membership. [Tolley Dep. 114:13-18; 117:5-10].  Since Rivera was already denied membership benefits from PartsBase, PartsBase could not have sold information to Rivera or his company via membership. [Tolley Dep. 114:13-18; 117:5-10].  PartsBase concedes that Rivera's company's membership had been terminated prior to Plaintiff's emails to Rivera, but offers evidence that it could have tried to sign them back up if Plaintiff had not been sending the information to Rivera. [Tolley Dep. 120:8-121:10].

    Second, PartsBase extends the following theory with regard to damages caused by Plaintiff alleged breach: Plaintiff provided confidential information to Rivera during working hours, and by using PartsBase's business resources (i.e., computer, internet, software, e-mail, etc.).  [Tolley Decl. re "damages" at ¶ 8].  Accordingly, PartsBase has been damaged not only by paying wages to Munroe for time she spent misusing the Company's business resources and confidential information, but also by incurring litigation costs related to defending Munroe's wage and hour claims, for which Munroe seeks additional compensation for time during which Munroe was not performing work for the Company's benefit.   [Tolley Decl. re "damages" at ¶¶ 8-9.]. Plaintiff counters with the following evidence to contradict PartsBase's second damages theory: The multiple emails that Plaintiff sent Rivera consisted of approximately 3-5 minutes of work time, and was primarily done during Saturdays or lunch hours when Plaintiff was already clocked out. [Munroe Dep. 208:15-209:13; 210:11-22; 211:9-14; Munroe Aff. ¶ 22].

    Based on the foregoing, there are genuine issues of material fact precluding summary

11

judgment as to PartsBase's claim for breach of confidentiality agreement as alleged in Count I of the Amended Counterclaim.

**Counterclaim Count II: Conversion**

Conversion is defined as, "an act of dominion wrongfully asserted over another's property inconsistent with his ownership therein. In essence, conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time. It is the disseisin of the owner or an interference with legal rights which are incident to ownership, such as a right to possession." Special Purpose Accounts Receivable Co-op Corp. v. Prime One Capital Co., 125 F. Supp. 2d 1093, 1099-1100 (S.D. Fla. 2000) (quoting Burger King Corp. v. Austin, 805 F.Supp. 1007, 1012 (S.D. Fla. 1992)) (citations omitted). Florida courts have identified three elements necessary to state a claim for conversion: (1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein. Id.; Warshall v. Price, 629 So.2d 903, 904 (Fla. 4th DCA 1993) (analyzing each element to find that plaintiff had established conversion claim).

PartsBase contends that, by sending allegedly confidential emails to Rivera, Plaintiff converted its confidential information, computer, internet, software, email, and wages paid to Plaintiff for the time she spent emailing Rivera. PartsBase points to evidence that Munroe provided confidential information to Rivera during working hours, and by using PartsBase's business resources (computer, internet, software, e-mail). [Tolley Decl. re "damages" at ¶ 8].

As explained above, there are genuine issues of material fact as to whether the information provided to Rivera was confidential. See supra.

Based on the foregoing, there are genuine issues of material fact precluding summary

judgment as to PartsBase's claim for conversion as alleged in Count II of the Amended Counterclaim.

**Counts III and IV - FLSA Anti-Retalibation claims against Defendants Partsbase and Hammond**

The FLSA's anti-retaliation provision makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under [the FLSA] ..." 29 U.S.C. § 215(a)(3). Both the FLSA and Title VII are remedial statutes whose effectiveness depends on the employee's ability to bring claims thereunder with impunity. Torres v. Gristede's Operating Corp., 2008 WL 4054417, *16 (S.D.N.Y. 2008). Thus, "FLSA retaliation claims are governed by the same legal analysis applicable to retaliation claims under Title VII." Beltran v. Brentwood N. Healthcare Ctr., LLC., 426 F.Supp.2d 827, 833 (N.D.Ill. 2006). See Robinson v. Shell Oil, Co., 519 U.S. 337, 346 (1997) ("[A] primary purpose of antiretaliation provisions [is] [m]aintaining unfettered access to statutory remedial mechanisms."); Darveau v. Detecon, Inc., 515 F.3d 334, 342 (4th Cir. 2008) ("Although the two statutes [Title VII and the FLSA] seek to combat separate workplace problems, the purpose of their retaliation provisions is one and the same-namely, to secure their substantive protections 'by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees.' ").

For Plaintiff to prevail on her retaliation claim, she must demonstrate that: (1) she was engaged in a protected activity; (2) Defendant was aware of Plaintiff's participation in the protected activity; (3) Defendant took adverse employment action against Plaintiff; and (4) a causal connection existed between the protected activity and the adverse action. Fei v. WestLB

AG, 2008 WL 594768, *2 (S.D.N.Y. 2008).  Here, Plaintiff satisfies the first two prongs because she engaged in protected activity by filing suit to recover her unpaid wages, which qualifies as protected activity under the FLSA and the Defendants are obviously aware of this. Plaintiff also satisfies the fourth prong, because the closeness in time between the filing of the complaint and the adverse action can establish a causal connection. Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir. 2001); see Kreinik v. Showbran Photo, Inc., 2003 WL 22339268, *8 (S.D.N.Y. 2003) ("[T]his Court has permitted a plaintiff to challenge a defendant's counterclaims as retaliatory, where, as here, the claims could have been asserted earlier, but were instead asserted only after the plaintiff had initiated the action seeking to vindicate his federal rights.").

The issue in dispute is whether Defendants' counterclaims for breach of confidentiality agreement and conversion constitute an "adverse employment action."  The assertion of a claim in litigation can sometimes constitute unlawful retaliation. Orr v. James D. Julia, Inc., 2008 WL 2605569, *16 (D.Me. 2008); Fei v. WestLB AG, 2008 WL 594768, *3 (S.D.N.Y.2008). Courts have held that baseless claims or lawsuits designed to deter claimants from seeking legal redress constitute impermissibly adverse retaliatory actions. See, e.g., Darveau v. Detecon, Inc., 515 F.3d 334, 343 (4th Cir. 2008) (finding allegation that plaintiff's employer filed a lawsuit against him alleging fraud with a retaliatory motive and without a reasonable basis in fact or law an actionable adverse employment action under FLSA).  Bad faith or groundless counterclaims and other legal proceedings against employees who assert statutory rights are actionable retaliation precisely because of their "in terrorem effect." Torres v. Gristede's Operating Corp., 2008 WL 4054417, *17 (S.D.N.Y. 2008), citing Bill Johnson's Restaurant v. NLRB, 461 U.S. 731, 740 (1983) (acknowledging that "by suing an employee who files charges ... an employer can place its

14

employees on notice that anyone who engages in such conduct is subjecting himself to the possibility of a burdensome lawsuit").

For Plaintiff to prevail on her retaliation claim, she must demonstrate that Defendants' counterclaims (1) were filed for a retaliatory motive and (2) lack a reasonable basis in fact or law. See Darveau, 515 F.3d at 343-44 (reversing district court order dismissing retaliation claim where plaintiff alleged his employer filed a lawsuit against him with a retaliatory motive and without a reasonable basis in fact or law); Barnes v. Akal Sec., Inc., 2005 WL 1459112, *5 (D.Kan. 2005) (agreeing with Defendants analysis of the law that "the filing of a counterclaim can not be actionable retaliation unless Plaintiffs establish (1) retaliatory motive and (2) lack of a reasonable basis for the claims"); Torres, 2008 WL 4054417, *17 ("Courts have held that baseless claims or lawsuits designed to deter claimants from seeking legal redress constitute impermissibly adverse retaliatory actions, even though they do not arise strictly in an employment context.") (emphasis added); Ergo v. Int'l Merch. Servs., 519 F.Supp.2d 765, 781 (N.D.Ill.2007) (holding that a compulsory counterclaim is not actionable for retaliation unless it is totally baseless); Orr., 2008 WL 2605569, *17 (accord).

There is record evidence to support the conclusion that but for the filing of Plaintiff's FLSA claims, Defendants would not have filed their counterclaims. [Tolley Dep. 79:25-80:2]. In six months, Defendants took no steps to sue Plaintiff for this alleged breach. [Tolley Dep. 79:9-24]. Additionally, Rivera had email conversations with other employees of Defendants, including a Jose Gutierrez [Tolley Dep. 123:4-10). Defendants did not file an action against Gutierrez, who, unlike Plaintiff, did not sue the Defendants for FLSA violations. [Tolley Dep. 124:2-8].

Nonetheless, even assuming the retaliatory motive prong is met, Plaintiff's retaliation claim must fail if she cannot prove that the counterclaims lack a reasonable basis in fact or law. See Darveau, 515 F.3d at 343 - 44; Barnes v. Akal Sec., Inc., 2005 WL 1459112, *5-6. As the court held in Barnes, "the ultimate standard for determining whether a counterclaim has a 'reasonable basis' is whether there is a genuine issue of material fact." 2005 WL 1459112, *6. Because the Court has concluded that genuine issues of material fact exist with regard to Defendants' counterclaims, which must be resolved at trial, see supra, the Court finds that the counterclaims are not baseless. Accordingly, Plaintiff cannot meet both elements required to prove that Defendants' counterclaims constitute actionable FLSA anti- retaliation. Thus, Defendants are entitled to summary judgment as to Plaintiff's claim for FLSA anti-retaliation as alleged in Count III of the Amended Complaint.

**Conclusion**

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment [DE 56] is **GRANTED IN PART AND DENIED IN PART as follows:**

(1) Summary judgment is **GRANTED** in favor of the Defendants as to Plaintiff's claim for minimum wage pay as alleged in Counts I and II of the Amended Complaint.

(2) Summary judgment is **DENIED** as to Plaintiff's claim for overtime pay as alleged in Counts I and II of the Amended Complaint.

(3) Summary judgment is **DENIED** as to PartsBase's claim for breach of confidentiality agreement as alleged in Count I of the Amended Counterclaim.

(4) Summary judgment is **DENIED** as to PartsBase's claim for conversion as alleged in Count II of the Amended Counterclaim.

(5) Summary judgment is **GRANTED** in favor of the Defendants as to Plaintiff's claim for FLSA anti-retaliaction as alleged in Counts III and IV of the Amended Complaint.

       **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 17th day of February, 2009.

                                                      KENNETH A. MARRA
                                                      United States District Court

Copies furnished to:
all counsel of record